# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 CR 112** |
| | ) | |
| **v.** | ) | **Judge Robert M. Dow, Jr.** |
| | ) | |
| **ANDREW CARR and** | ) | **Magistrate Judge Jeffrey Cole** |
| **WENDY CARR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

The United States has moved to revoke the bonds of defendants, Dr. Andrew Carr, a licensed chiropractor, and his wife, Wendy Carr. [Dkt. # 51]. Judge Dow has referred the matter here. [Dkt. # 64]. I have jurisdiction to decide the motion pursuant to 18 U.S.C. §§3041, 3142, 3145(b) and 3148.

An extended hearing was held July 12, 2012, at which a Special Agent of the Federal Bureau of Investigation testified and was cross-examined by defendants' counsel. The hearing was continued until July19. On the 19th, the defendants asked for a further continuance until August 8, 2012. [Dkt. # 63]. Then, on July 25, 2012, came the Government's Emergency Supplemental Motion to Revoke Dr. Carr's bond based upon his claimed suicide attempt. [Dkt. #64]. The evidence was clear that Dr. Carr told his Pretrial Services Officer from the hospital to which he had been taken that he had attempted to hang himself but the belt broke. He said he would have shot himself had he had access to a gun.[1]     I granted the Government's emergency motion. [Dkt.

---

[1] Dr. Carr had texted friends who became alarmed that he was contemplating suicide. They contacted
(continued...)

# 66]. Thus, upon his release from the hospital, Dr. Carr was arrested and taken to the Kankakee County Jail and placed on suicide watch. He was taken off that status when the medical staff at the jail concluded there was no longer a danger that he would attempt to kill himself.

At a hearing on August 3, a psychiatrist from the Elgin State Mental Hospital and a nurse from the Kankakee County Jail testified that Dr. Carr was not suicidal and posed no present risk of physical harm to himself or others. I therefore ordered him released from custody on August 3 [Dkt. #71], pending the outcome of the Government's original motion to revoke his bond. On August 8, the hearing on that motion was concluded.

## FACTUAL BACKGROUND

On February 15, 2011, Dr. Carr was charged by criminal complaint with health care fraud, in violation of 18 U.S.C. §1347. On February 17, 2011, Dr. Carr was arrested, and I ordered him released on a $10,000 own recognizance bond. The conditions of release prohibited Dr. Carr from violating any federal, state, or local law. [Dkt.#7-80]. On June 16, 2011, a grand jury returned an indictment charging Dr. Carr and his wife, Wendy Carr, with seven counts of health care fraud, in violation of 18 U.S.C. §1347. On June 30, 2011, she was arraigned, and I ordered her released on a $4,500 own recognizance bond, which, like the bond of her husband, included as a condition that she not violate any federal, state, or local law while on release. [Dkt. #28-29].

It is the Government's contention that beginning in early August 2011, Dr. and Mrs. Carr

---

[1](...continued)
his wife who rushed home and found him lying in a fetal position in extreme emotional anguish. She had him taken to the Elgin Mental Health Center, where, he reported having suicidal ideations and admitted that he had made some statements that he wanted to harm himself. But he told the doctors that "he was not serious about his suicidal lapse, he just felt overwhelmed." He said that "he would never hurt himself as it would impact his family negatively."

formulated and executed a scheme to defraud Blue Cross Blue Shield through the submission of claims for insurance reimbursement for medical and chiropractic services that had not been provided to the patient on whose behalf the bills were being submitted. It was a further part of the scheme, the Government contends, that in connection with chiropractic services that were being rendered by Dr. Carr, bills would be sent under the names of doctors who had no relationship with the Phoenix Medical Group, beyond allowing their names to be used for billing purposes.[2]

During the period relevant to the instant Motion to Revoke Bonds some 600 claims were submitted on behalf of approximately 40 patients. The claims totaled $274,000, of which $94,000 was actually paid to a corporation set up by the Carrs. (Govt. Ex. D). The government has estimated that a very substantial percentage of these claims were totally fraudulent. The exact percentage is unclear but it is not insignificant. Had the scheme not been employed, the amount that would have been paid to Dr. Carr –assuming anything would--would have been approximately 25% less than what was realized since Dr. Carr was not a Blue Cross Blue Shield approved provider.

The alleged scheme was subtle. But, of course, the most successful schemes to defraud are those dressed in the garb of honesty and hedged about with all the appearances of legal and enforceable undertakings. If the intent and purpose are to deceive and defraud the unwary, it matters not what form the project is made to take. *Cf. Brooks v United States,* 146 F.223 (8th Cir.1906).

## THE OUTLINES OF THE SCHEME

---

[2] One of the doctors had never even been to the offices of the Phoenix Medical Group and had told the Carrs that they could not use his name for billing insurance providers. Yet bills were submitted in his name. Another doctor allowed his name to be used for billing purposes but restricted the codes representing medical services that could be used in connection with those bills. Nonetheless, bills were submitted to Blue Cross Blue Shield using prohibited codes. Moreover, that doctor performed no oversight or supervisory functions even on the few occasions he was at the Phoenix Group offices.

For some period prior to September 8, 2010, Dr. Carr had been operating under the umbrella of a company he formed called the Edgewater Rehab & Wellness Center. On the 8th, Blue Cross Blue Shield of Illinois terminated Dr. Carr's and Edgewater's participation in the Blue Cross PPO network for "documented abusive billing practices which [he] had not corrected after appropriate notification."(Govt. Ex. F).[3]  A year later, on August 10, 2011– two months after the defendants were indicted – The Phoenix Medical Group, Inc. ("Phoenix Medical") submitted a Participating Provider Agreement to Blue Cross Blue Shield to permit Phoenix Medical to be a provider, thereby permitting patients carrying Blue Cross Blue Shield insurance to receive treatments by medical service providers at Phoenix Medical and for those treatments to be covered by Blue Cross Blue Shield in accordance with the PPO Agreement.  In network providers were paid a greater percentage of the bill, thereby making it cheaper for the patient to use the services of that medical provider. The address for Phoenix Medical was listed on the Agreement as 650 E Terra Cotta Ave., Suite 100, Crystal Lake, Illinois. The Agreement was signed, "Lynn Jenson," which is a combination of Mrs. Carr's middle name and maiden name. (Government's Ex. A). The Provider Application shows Lynn Jenson as the "billing contact." (Govt. Ex. I).

It is the government's contention that this invented  name was used in order  to conceal Dr. Carr's and his wife's involvement in the Phoenix Medical Group in light of the prior cancellation of  Edgewater Rehab & Wellness Center's provider agreement. On September 26, 2011, Phoenix Medical was registered as a corporation with the Illinois Secretary of State with the registered agent shown not as Lynn Jenson, but as Wendy Carr, 650 E Terra Cotta Ave., Suite 100, Crystal Lake,

---

[3] The defendants have argued that there is no evidence that Dr. Carr received this letter.   The argument is meritless.  The evidence in the case proves circumstantially that he did.  But even if he did not, the evidence is still sufficient to find that the formation of the Phoenix Medical Group and its subsequent activities were part of a scheme to commit healthcare fraud.

Illinois. (*See* Govt. Ex. B).

Contemporaneous with these events, beginning in about August 2011, Mrs. Carr began to advertise and hold fitness classes at her business, the "Fit Stop," at 650 E Terra Cotta Ave., Suite 101, Crystal Lake, Illinois, which is the same address as The Phoenix Medical Group, which operates out of Suite 100.[4]  The Fit Stop was contiguous to the Phoenix Medical Group and shared a common wall, which the Carrs opened to allow free access between the two suites. (*See* Defendants' Response to Motion to revoke Defendants' Bonds at 2, ¶ 5).

It was an explicit condition of Dr. Carr's bond that he attempt to find work.  Dr. Carr was under supervised release and thus was reporting to a pretrial services officer.  He notified her that he was working with his wife, as well as identifying another person or entity with whom he was working.  Significantly, he made no mention of the Phoenix Medical Group even though this was his chief source of income and the focus of all his time and energy.

In August 2011, a person identified by the Government as "Individual MS" signed up for a promotion for 12 fitness classes at the Fit Stop. According to MS, the Carrs taught the classes. After MS complained of some tightness in her back, Dr. Carr told her that he was a chiropractor and could provide her with an adjustment to ease the tightness.  MS received chiropractic adjustments on three or four different occasions at the Fit Stop, typically before attending a fitness class. MS gave her Blue Cross Blue Shield insurance card to Andrew Carr, who made a photocopy before returning the card to her. He told her that the Explanation of Benefits forms she would receive from her insurance company for his services would list The Phoenix Medical Group as the provider. MS had never

---

[4] The advertisement shows a picture of Mrs. Carr, listing her name as Wendy Kust, which is the name she uses in connection with her participation in body building events.

heard of Phoenix Medical, and Dr. Carr did not explain what it was or why he was submitting health care insurance claims under that name.

MS received three to four treatments from Dr. Carr in September and October 2011. According to Blue Cross Blue Shield records, Phoenix Medical submitted four claims for services provided to MS in September and October 2011, totaling $1,134. However, these four claims listed another doctor, Dr. GK, as the rendering provider. (Govt. Ex. D). When interviewed by law enforcement agents, MS stated she did not recognize Dr. GK's name. Nor did she recognize Dr. GK (this is not his real name) from pictures shown to her. When the agents showed MS pictures of each of the defendants, she correctly identified Dr. Carr and Wendy Carr.

According to MS, she did not receive any treatments from Dr. Carr, Wendy Carr, or anyone else at Fit Stop or Phoenix Medical in November or December 2011. According to Blue Cross Blue Shield records, Phoenix Medical submitted seven claims to Blue Cross Blue Shield for services provided to MS in November and December 2011, totaling $7,385. Blue Cross Blue Shield paid Phoenix Medical $3,174 for these seven claims. These seven claims also listed Dr. GK as the rendering provider. (Govt. Ex. D). Dr. GK told agents that he never allowed his name to be used for billing and that he had never been to the offices of the Phoenix Medical Group.

Law enforcement agents also interviewed at least three other individuals who attended fitness classes at Fit Stop, where they each met Andrew and Wendy Carr. Each received chiropractic treatments from Dr. Carr and gave their Blue Cross Blue Shield health insurance cards to either Dr. or Wendy Carr. They each received only a few chiropractic treatments, but were billed for many more. In addition to listing Dr. GK as the rendering provider on some the claims forms, some of the claim forms listed another doctor, Dr. DF, as the rendering provider. Andrew Carr is not listed as

the rendering provider on any of the claims submitted by Phoenix Medical to Blue Cross Blue Shield. (Govt. Ex. D). When interviewed by law enforcement agents, these three patients each stated that they did not recognize either Dr. GK or DF's names. However, some of these patients recognized Dr. DF's photo as someone they saw at Fit Stop, but they did not receive any medical or chiropractic treatments from him. (*See* Govt. Ex. D). According to Blue Cross Blue Shield records, from July 2011 through February 2012, Phoenix Medical submitted claims totaling approximately $274,621, and received a total of approximately $94,375 from Blue Cross Blue Shield for these claims.

The Phoenix Medical Group maintains a bank account at Harris Bank, and lists 650 E Terra Cotta Ave, Suite 100, Crystal Lake, Illinois as its address. This account was opened on September 27, 2011. Wendy Carr also maintains a bank account at Harris Bank. The checks from Blue Cross Blue Shield in connection with MS's insurance claims, along with many other Blue Cross Blue Shield claims, were deposited into either the Phoenix Medical Group or the Wendy Carr bank accounts at Harris Bank. According to the Harris Bank records, checks were written on the Phoenix Medical Group account to Wendy Carr, to Dr. Carr's ex-wife, to Carl Buck (Wendy Carr's attorney in this case) or his law firm, to Wendy Carr's children's schools, to the landlord for Dr. and Wendy Carr's home in Lake in the Hills, among other payees connected to the defendants. Most, if not all, of these checks were signed "Wendy Carr."

Based on these facts, it is the Government's contention that beginning in July 2011, and continuing through June 2012, Dr. and Mrs. Carr devised and jointly participated in a scheme to defraud health care benefit programs including Blue Cross Blue Shield of Illinois, and to obtain, by means of false and fraudulent pretenses, representations and promises, money or property owned

by and under the custody and control of such programs, in connection with the delivery or payment for healthcare benefits, items and services. The Government also argues that on December 6, 2011 Andrew Carr and Wendy Carr fraudulently submitted to Blue Cross Blue Shield a $1,232 claim for health care services that were claimed to have been provided to MS at Phoenix Medical on December 5, 2011, knowing that those services had never been provided to her. Based on these facts, which are supported by evidence admitted at the hearings, the Government argues that there is probable cause to believe that Andrew and Wendy Carr have violated the terms of their bonds, and that the bonds should be revoked and the defendants placed in the custody of the United States Marshall.

## ANALYSIS

### 1.

18 U.S.C.A. § 3148 provides the backdrop for analysis. In brief and so far as relevant here, it provides that a person who has been released on bond under 18 U.S.C. §3142 shall have his bond revoked if, after a hearing, the "judicial officer" finds that there is probable cause to believe that the person has committed a Federal crime while on release, and also finds that based on the factors in 18 U.S.C. §3142(g) there is no condition or combination of conditions of release that will assure that the person will not pose a danger to the safety of any other person or the community or that the person is unlikely to abide by any condition or combination of conditions of release. Section 3156(a)(1) defines "judicial officer" as any person or court authorized pursuant to 18 U.S.C. §3041 to detain or release a person before trial in a court of the United States. Magistrate judges are expressly included within the scope of that section.

If the court finds that there is "probable cause" to believe that while on release the defendant committed a federal offense, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If, however, the judicial officer finds that there are conditions of release that will assure that the person will not pose such a danger and that the person will abide by such conditions, the court shall treat the person in accordance with the provisions of §3142 and may amend the conditions of release accordingly.

**2.**

The defendants do not suggest, nor could they plausibly, that as used in § 3148 the phrase "danger to any other person or to the community" encompasses only physical dangers and that economic predations are outside the ambit of the statute. Such a construction would mean that a defendant could not rob a bank while on release without being subject to having his bond revoked, but would not run that risk if he only engaged in a scheme to defraud the bank of its money. That would make no sense, and "courts read statutes to make sense rather than nonsense. "Absurd possibilities are ruled out." *United States v. Logan*, 453 F.3d 804, 806 (7th Cir. 2006). *See also United States. v. Rodriguez-Rodriguez*, 453 F.3d 458, 461 (7th Cir. 2006)("What sense could that make of the statutory text?"); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284 (7th Cir. 2002).

Not surprisingly, the cases have long recognized that the term "danger," as used in §3148 refers to unlawful conduct whether economic or physical in nature. That conclusion is consistent with the Senate Committee report accompanying the Bail Reform Act. *See* Report of the Senate Committee on the Judiciary, S.Rep.No. 98-225, 98th Cong., 2d Sess. (1984), U.S. Code Cong. & Admin. News 3182, 3195-96. Many of the older cases are collected in *United States v. Erickson,*

506 F.Supp. 83, 88 -89 (D.C. Okl. 1980). More recent cases include *United States v. Bartok*, 2012 WL 1034645, 2 (2nd Cir 2012); *United States v. Maddoff,* 316 Fed. Appx. 58 (2nd Cir. 2009); *United States v. Reynolds,* 956 F.2d 192 (9th Cir. 1992); *United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979); *United States v. Jinwright,* 2010 WL 2926084, 2-3 (W.D.N.C. 2010*); United States v. Maddoff,* 586 F.Supp. 2d 240, 251 (S.D.N.Y. 2009).

**3**.

The standard of proof applicable in bond revocation cases is not a particularly rigorous one. The Government need only demonstrate that there is "probable cause" to believe that a crime has been committed by the defendant while on bond. That requires that the evidence show "a fair probability" that a crime has occurred and that the defendant committed it. *Cf., Alabama v. White,* 496 U.S. 325, 330 (1990). While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties. *United States v. Bartok*, 2012 WL 1034645, 2 (2nd Cir 2012). "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers." *Texas v. Brown,* 460 U.S. 730, 742 (1983). And so too are judges.

The evidence against Dr. Carr is sufficient to establish probable cause that while on bond he engaged in a fraudulent health care scheme like that which resulted in his indictment in the first place. He set up a new corporation manifestly for the purpose of billing Blue Cross Blue Shield and perhaps other insurance companies for medical services he would render under the names and identifying numbers of physicians whose sole contribution was permission to use their names on billing statements. It was a part of the scheme that he would bill under the name Phoenix Medical

Group for medical services neither he nor any other medical professional would provide. To insure that Blue Cross Blue Shield would not discover his and his wife's involvement in this new entity, Dr. Carr did not use his own name or even his wife's name. Instead, he chose a fictitious name, "Lynn Jenson,"as the signatory on the Provider Agreement. The use in fraud schemes of aliases and fictitious names is commonplace, *United States v. Javan,* 383 Fed.Appx. 596, 599 (9th Cir. 2010); *United States. v. Gignac,* 301 Fed.Appx. 471, 474 (6th Cir.2008), and the defendants have offered no conceivable, legitimate reason for having carefully chosen this combination of names.

This subterfuge contrasts markedly with the way Dr. Carr dealt with the Illinois Secretary of State's Office in September 2011, when Phoenix Medical registered as a corporation with the Illinois Secretary of State. There being no need for concealment, none was employed, and the registered agent of the corporation was not "Lynn Jenson" but Wendy Carr, 650 E Terra Cotta Ave., Suite 100, Crystal Lake, Illinois. (*See* Govt. Ex. B).

With the stage thus set, Dr. Carr, through the Phoenix Medical Group, began sending bills for payment to Blue Cross Blue Shield for medical services to customers at the Fit Stop (and others) ostensibly rendered by medical doctors, as well as bills for medical services never provided by anyone. The defense has tried to say that Dr. Carr's good faith was evidenced by his attempt to deal fairly with billing irregularities as soon as they were brought to his attention by several of his "patients." (*See Defendants' Response to Motion to Revoke Bond* at 6-8).[5] That evidence was

---

[5] The defendant's response to the government's motion to revoke defendant's bond [Dkt #57] appears to have been filed under seal without permission of court. There is nothing in that legal brief which warrants "under seal" treatment. It is nothing more than a recitation of argument and references to a section of the United States Code and supporting exhibits. Litigation is to be conducted in public unless there is some compelling reason not to; there is none here. Closed proceedings breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law. *Richmond Newspapers, Inc. v. Virginia*,448 U.S. 555, 595 (1980); *Nilssen v. General Elec. Co.*, 2011 WL 633414, *1, n.2 (N.D.Ill. 2011).

singularly unconvincing.

First, it is not an indicator of innocence or good faith to try to undo an apparent fraud after it has been discovered. Second, the evidence was that Dr. Carr did not even make good on his promise to deal fairly with a patient when in late 2011 she complained to him about being billed for services never rendered, including laboratory services. *Id*. at ¶29. The promise to rectify the situation may be viewed as a lulling statement, *United States v. McGowan,* 590 F.3d 446, 457 (7th Cir. 2009), especially since nothing was done. The defense has sought to explain this failure by Dr. Carr by claiming that long wait times on the insurance company's phone system prevented him from doing so, and he then became "distracted" and failed "to follow through on this." *(Defendants' Response to Motion to Revoke Bond* at 8, ¶ 30).

That explanation is implausible and contrived. And, it does not explain why a "Claim Review Form," a letter, or some other equivalent document could not have been written, as the defendants actually did on one occasion after their fraudulent billing had come to light. (*See* Govt. Ex. H). It is interesting to note that the name shown as the contact person at Phoenix is "Lynn"– undoubtedly referring to Lynn Jenson, Mrs. Carr's alias. This use of the phony name was a further attempt to prevent Blue Cross Blue Shield from learning about his and his wife's involvement with the Phoenix Medical Group.

This insistence on preventing disclosure of that involvement was also what, it may be reasonably inferred, motivated Dr. Carr not to tell his pretrial services officer about his involvement in the Phoenix Medical Group, even though he did tell her that he was working with his wife at the Fit Stop and about some other inconsequential affiliation. It is an axiom of human experience that

"honesty of purpose prompts frankness of statement," and that "concealment is indicative of fraud." *Crosby v. Buchanan*, 90 U.S. 420, 457 (1875). Dr. Carr's concealment of the Phoenix Medical Group speaks volumes about its illegitimacy and the nature of the enterprise Dr. Carr was conducting out of Phoenix's offices.

Dr. Carr's Response to the Motion to Revoke Bond and his Supplement to that Response boil down to insisting that he is a good and charitable man as evidenced by the fifteen letters attesting to his volunteer work in the Church or with children, etc., and therefore it is unlikely he would have engaged in health care fraud while on bond, and that if his bond is not revoked he will now abide by its conditions. [6] Indeed, the defendants go so far in the Supplement to assert that they are "people of excellent character." (Supplement at 8, ¶36). The record in this case belies that contention. People of excellent character simply do not do what the record reveals the Carrs have done. And people of excellent character do not do what Dr. Carr did when confronted by a patient who had learned of Dr. Carr's fraudulent billing. Dr. Carr told him that he could have free services to the end of the year. The patient responded by saying that he liked to do things "on the up and up." Dr. Carr responded, "it's more fun not to be on the up and up."

The evidence is compelling that both Dr. Carr and his wife were cunning and devious in their dealings with Blue Cross Blue Shield, with the "patients" Dr. Carr treated, and even with Pretrial

---

[6] The original Response to the Motion to Revoke had five letters. The Supplement to the Response filed on the morning to the ruling has fifteen letters, some of which are duplicates. The number, however, does not change the result.

Services, from whom Dr. Carr concealed the Phoenix Medical Group and his ownership of it. Moreover, even after being caught and promising by their signatures on the "Conditions of Release" (Govt's Ex. J) that they would not commit any federal or state crime, they immediately concocted a new scheme to defraud Blue Cross Blue Shield.

While the kind of testimonial letters submitted by the defendants may be considered under §3142{g}, their utility is limited and cannot overcome the rather solid evidence in this case, which proves once again that even people of impeccable reputation may commit crimes. *United States v. Burke,* 781 F.2d 1234, 1239 (7th Cir.1985). In any event, a person's "character" is simply one of a number of nonexclusive factors to be considered in determining initially whether bond should be granted and whether, if it is to be revoked, there are conditions that will assure the safety of the community.

What is clear from any fair review of the evidence is that the government has shown that there is probable cause to conclude that while on bond Dr. Carr, with the intent to defraud Blue Cross Blue Shield, initiated a fraudulent healthcare scheme almost identical to the one for which he was indicted. The claim that Phoenix Medical group was a perfectly legitimate enterprise with a "medical director" who oversees all services, both medical and chiropractic is unpersuasive and hopelessly contrary to the evidence. (Response at 3, ¶¶ 9-11). Not one of the doctors whose names the Carrs provided in their application to Blue Cross Blue Shield, (Govt. Ex. I-L) had any real or functional involvement with Phoenix.

The defendants' theory that the Phoenix Medical Group was a perfectly legitimate enterprise because it had some loose, unexplained affiliation with one or more doctors subordinates substance

to form. But here, as always,"[i]t is the substance of what they do, and not the form in which they clothe their transactions, which must afford the test." *Electric Bond and Security Company v. SEC*, 303 U.S. 419, 440 (1938). *See also, Welch v. Mandeville,* 14 U.S. (1 Wheat) 233, 236 (1816)(Story, J.)("It would be strange, indeed, if parties could be allowed, under the protection of its forms, to defeat the whole objects and purpose of the law itself."). The reality is that there was no doctor overseeing the services provided by Dr. Carr and none provided any sort of legitimate involvement with or oversight of the Phoenix Medical Group, as the defendants have tried to suggest. There was simply an arrangement that allowed Phoenix to submit bills using a few doctors' names and certain of their billing codes when billing Blue Cross Blue Shield. Dr. Carr did not even honor those limitations and billed for services under codes he was told he could not use.

**4**.

But that is not the end of analysis, since §3148 requires that as a precondition to revocation of bond the court must find that there is no condition or combination of conditions of release that will assure that the defendant will not pose a danger to the safety of any other person or the community. 18 U.S.C. § 3148 (b)(2)(A). While there is a presumption that no set of combinations will protect the community, the presumption is rebuttable. If the court finds that there are conditions of release that will assure the safety of the community, and that the person will abide by such conditions, bond may be continued under such conditions as the court in its discretion determines are appropriate under 18 U.S.C.§3142.

Whether the evidence suffices to show that a defendant will not abide by any conditions of release is to be determined under a preponderance of the evidence standard. *United States v. Aron*,

904 F.2d 221, 224 (5ᵗʰ Cir. 1990). That burden is easily met in this case. Dr. Carr's response to having been canceled by Blue Cross Blue Shield and having been indicted in June 2011, was to immediately embark on what was essentially the same scheme under a different name. The defendants have conceded that since about July, 2011–one month after their indictment–they began operating out of rented facilities next to each other in Crystal Lake. The new "patients" (or at least a number of them) for Dr. Carr's venture were provided by his wife's business.[7]

Dr. Carr then caused fraudulent bills to be submitted by the Phoenix Medical Group. The evidence is sufficient to find that his conduct was willful, premeditated, and devious. It is idle to suggest that if given another chance, he would abide by the very conditions of bond he promised to honor at the time bond was originally granted and which he so quickly and brazenly breached. Home confinement is not the answer since Dr. Carr has worked out of his house in the past and requiring that he remain at home would not therefore ensure that he would not engage in further healthcare fraud.

**5.**

On August 7, 2012, the day before the hearing was to conclude and the court to rule, the

---

[7] The defendants' Response states that Mrs. Carr only provides 10% of the patients seen by Phoenix. The representation is not under oath or supported by a declaration of either of the defendants. Statements in briefs are not substitutes for evidence, and I am not bound to accept them. *See Woolard v. Woolard,* 547 F.3d 755, 760 (7th Cir.2008); *United States v. Stevens,* 500 F.3d 625, 628–29 (7th Cir.2007); *Ner Tamid Congregation of North Town v. Krivoruchko,* 620 F.Supp.2d 924, 928 (N.D.Ill.2009)(collecting cases). Further, that Mrs. Carr may actually have been running her business as a legitimate entity is quite beside the point. The question is whether the evidence reveals that it was being utilized, even in part, to provide the raw materials as it were for what was essentially an illicit enterprise being run out of the adjacent suite.

defendants filed a Supplement to their Response to the Motion to Revoke. [Dkt #73]. A courtesy copy was served on the court at about 9:00 a.m. the next day – the morning of the ruling. More than three weeks have passed since the defendants filed their response to the motion. Yet, in that time, they have vigorously opposed the motion on the merits as they most assuredly had the right to do. Now suddenly, the argument is that Dr. Carr will give up his license and therefore will not pose any further danger to the community because he cannot engage in further healthcare fraud. This is too little, too late. It is a desperate afterthought, and one that does not require denial of the government's motion to revoke bond, as the defendants insist it does.[8]

Dr. Carr's attempt to avoid revocation by surrendering his license is insufficient. There is nothing to show that he would not be able to reinstitute his license without the court's or his lawyer's knowledge. Dr. Carr has shown a callous disregard of the conditions of his initial bond, and his promise to give up his license is not credible. Beyond that, it is insufficient. Even without a license, Dr. Carr will not be precluded from continuing to engage in healthcare fraud. He could still hold himself out to patients as a chiropractor and not tell them he has given up his license. And there is nothing to prevent him from engaging in precisely the same scheme with other doctors whom he could enlist as he did before. The evidence shows Dr. Carr has no difficulty creating sophisticated schemes and in getting other doctors to go along with him. Giving up his license does not eliminate the risk to the community that his continued release on bond poses.

**6.**

---

[8] To be clear, the vice in the defendants' new stratagem is not that it comes too late and therefore cannot be considered. It is rather, that on the merits it fails. The defendants' position is that Dr. Carr was not available to sign the necessary letters since he was at Elgin and then in jail.

The evidence in this case clearly supports the Government's ultimate conclusion that there was skullduggery going on. But the more difficult question is whether Mrs. Carr is also responsible for the scheme and its implementation. In making that determination we cannot collectivize the Carrs as though they were fungible and assume that the probability that Dr. Carr violated §1347 leads to the conclusion that so too did his wife. Such an approach would ignore one of the most fundamental principles of our jurisprudence – that guilt is personal, not derivative. *Scales v. United States*, 367 U.S. 203, 224-225 (1961). Indeed, the doctrine of personal guilt partakes of the very essence of the concept of freedom and due process of law. *Schneiderman v. United States*, 320 U.S. 118, 154 (1943).

"Although only 'slight' evidence is needed to connect a defendant to a conspiracy, 'mere association with conspirators is not enough to establish participation in a conspiracy.'" *United States v. Gibbs,* 182 F.3d 408, 422 (6th Cir.1999). *See also United States v. Scott*, 267 F.3d 729, 738 (7th Cir. 2001)(The "mere association" instruction is designed to inform the jury that guilt should not follow from one's association with those who commit crimes; guilt may only be found when the defendant knowingly participated in the criminal activity."); *United States v. Sanchez*, 1 F.3d 1245 (7th Cir. 1993)("The government cannot meet its burden concerning a defendant's participation by proving his mere knowledge, association or presence."); *United States v. Linh H. Nguyen,* 2007 WL 1849428, 4 (7th Cir.2007); *United States v. Heath*, 188 F.3d 916, 921 (7th Cir. 1999).

Of course, these core principles apply to guilt by familial association, including schemes and conspiracies alleged to be composed of family members, such as husband and wife. *Sanchez, supra*; *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989). That one is married to a criminal does not support the inference that that person is a criminal or shares the spouse's guilty knowledge or

intent. *United States v. Forrest*, 620 F.2d 446, 451 (5th Cir. 1980). While these cases involved the sufficiency of evidence under a proof of guilt beyond a reasonable doubt standard, the underlying requirement of individual consideration of defendants applies equally here. The only difference is that the evidence, separately considered, is measured by a far less exacting standard.

There is not any direct proof of who signed the document bearing the name, Lynn Jenson. After all, her husband surely knew her middle and maiden names, and thus the use of the combined names does not prove she signed the form and standing alone proves nothing about Mrs. Carr's involvement in the scheme. But circumstantial proof is sufficient, *United States v. Sheneman,* 682 F.3d 623, 629 (7th Cir.2012), and is often more certain, satisfying and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

In this case, it is clear that Mrs. Carr was aware of her husband's activities and participated in them. She knew that her husband was operating what purported to be a medical facility of sorts under the name The Phoenix Medical Group in the space next to the Fit Stop, and that the pass-through constructed in the common wall between the contiguous office spaces facilitated the shuttling of prospective "patients" to Phoenix Medical Group. (Defendants' Exhibits B and B). [Dkt. #57]. A number of the individuals to whom Dr. Carr claimed to be providing medical services came from the Fit Stop. They gave their Blue Cross Blue Shield health insurance cards to either her or Dr. Carr.

Additionally, she was the registered agent for Phoenix, a signatory on the Phoenix Medical Group bank account into which many of the insurance checks were deposited – others went into her bank account; she signed checks drawn on the Phoenix Medical Group bank account for various

personal expenses (including the payment to her counsel in this case), and was involved in Phoenix's billing to Blue Cross Blue Shield – although she claims acting only at her husband's direction. (Response to Motion to Revoke Bond at 4, ¶ 13).[9] However, the government introduced evidence that Dr. Carr, himself, told a patient that his wife did all the billing. And she was the person – operating under the alias "Lynn"– to whom inquires from Blue Cross to Phoenix were to be directed. (Govt. Ex. G).

Other documents confirm her involvement in Phoenix's billing to Blue Cross. (Govt. Exs. I-L). Finally, the indictment against her in June 2010 gave her some awareness of at least what the government was contending constituted healthcare fraud against Blue Cross Blue Shield. When that scheme was replicated under the guise of the Phoenix Medical Group, there is at least probable cause to conclude she knew that she and her husband were not abiding by the condition of their bonds that they not violate federal law.

At the very least, Mrs. Carr was "willfully blind" to what was occurring in her very midst. The doctrine of willful blindness is well established in criminal law. Many criminal statutes like the federal mail fraud statute require proof that a defendant acted knowingly or willfully, and courts applying the doctrine have consistently held that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The rationale for the doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. The Seventh Circuit and every Federal Court of Appeals but one have fully embraced willful blindness, and it has been endorsed by the

_____

[9] The defendants have never argued that Mrs. Carr did not sign the checks drawn on the Phoenix account.

Supreme Court even in civil cases. *See Global-Tech Appliances, Inc. v. SEB S.A.,* __U.S.__, 131 S.Ct. 2060, 2062-2063 (2011); *United States v. Phillips,* __F.3d__, 2012 WL 3124891, 8 (7th Cir. 2012).

In sum, given the exceedingly low standard of proof that governs resolution of a motion to revoke bond, it must be concluded that there is probable cause to believe that Mrs. Carr violated federal law while on bond. But §3148 also requires that as a precondition to revocation the court find that there is no condition or combinations of condition of release that will assure that the defendant will not flee or pose a danger to the safety of any other person or the community. 18 U.S.C. § 3148 (b)(2)(A). While there is a presumption that no condition or combination of combinations will protect the community, the presumption is rebuttable, and if the court finds that there are conditions of release that will assure the safety of the community and that the person will abide by such conditions, bond may be continued under such conditions as the court in its discretion determines are appropriate under 18 U.S.C.§3142.

Mrs. Carr is not a doctor or chiropractor or nurse, and she has never held herself out as a medical professional of any kind. With her husband's bond revoked, she simply will not have the capability to treat patients or bill for treatments never performed. And with her husband in custody, and with no one to care for her four young children but her, it is a fair prediction that she will not engage in any further violations of federal law, lest she too lose her freedom and leave her children without parental care.[10] Such a judgment is, to be sure, something of an exercise in prophecy. But so too are initial bond decisions under §3142 and countless others decisions judges are routinely

---

[10] Three of the children are Mrs. Carr's by a previous marriage. Their ages are 9, 12, and 13. The fourth child is Dr. Carr's by a previous marriage and is 11 years of age.

required to make.  Indeed, "every day we have to wager our salvation upon some prophecy based upon imperfect knowledge." *Abrams v. United States*, 250 U.S. 616, 630 (1919)(Holmes, J., dissenting). But bond decisions are not simply guesses based on a judge's ineffable intuition; they are informed and intelligent forecasts made in view of all the relevant circumstances and guided by human experience and common sense, which always have a role to play.

Accordingly, the government's motion to revoke Dr. Carr's bond is granted, and the motion to revoke Mrs. Carr's bond is denied. The additional conditions of release to be imposed on Mrs. Carr will be set forth in a separate order.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE:8/9/12